UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SARAH ALASTRA,

    Plaintiff,                                          Case No. 08-cv-15265

v.                                                   HONORABLE STEPHEN J. MURPHY, III

NATIONAL CITY CORPORATION,
and NATIONAL CITY BANK

    Defendant.
    _____/

**OPINION AND ORDER DENYING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (docket no. 31)**

In this employment action, Plaintiff Sarah Alastra claims that Defendants National City Corporation and National City Bank (collectively referred to as "National City") fired her because she has epilepsy, and failed to accommodate her with a modified work schedule, in violation of both the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*, and Michigan's Persons with Disabilities Civil Rights Act (PWDCRA), Mich. Comp. Laws § 37.1101, *et seq*. Discovery has closed and National City moved for summary judgment on all of Alastra's claims. Since a reasonable jury could objectively find that National City fired Alastra because she is disabled and denied her a reasonable accommodation, the Court denies National City's motion for summary judgment.

**FACTS**

The following facts are undisputed unless otherwise indicated, and, if disputed, are stated in the light most favorable to Alastra. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (on summary judgment, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

Since the age of 15, Sarah Alastra has suffered from medically-intractable generalized epilepsy, which causes her to suffer from recurring grand-mal seizures. Compl. ¶ 8; Alastra dep. 33, 108. When having a seizure, Alastra becomes unconscious, falls to the ground, and shakes violently and uncontrollably until the seizure passes. She is frequently injured by these seizures, which typically occur in the morning hours, upon waking. Alastra dep. 109, 111. Immediately after a seizure, she is unable to do anything other than sleep for an average of eight hours. *Id.* at 111. Prescription medication helps reduce the frequency of the seizures but cannot eliminate their occurrence. *Id.* at 115.

The frequency of the seizures varies. Though she typically has approximately four seizures per month, *id.* at 110, she has suffered up to 25 seizures in one month, and in July of 2007 – while working for National City – experienced one seizure every two weeks for a period of around two to three months. Pl.'s Resp. Br. Ex. B, MED 300. Waking up early in the morning or otherwise being sleep-deprived triggers seizures. *Id.* at MED 286; Alastra dep. 194-95.

As a result of her epilepsy and recurring seizures, Alastra is restricted from driving. Alastra aff. ¶ 5. Michigan law prohibits her from driving unless she has been seizure-free for a period of six months. *See* Mich. Admin. Code r. 257.851(e)(i)(C) & 257.854.

Even when not suffering from a seizure or recovering from one, Alastra's epilepsy prevents her from performing various daily tasks including bathing or showering by herself due to risk of drowning or serious injury, caring for her son by herself, preparing breakfast, cooking hot meals, performing chores around the home, and grocery shopping. Alastra aff. ¶ 6; Alastra dep. 157-58.

Alastra was hired by National City on March 18, 2007 as a part-time bank teller working approximately 20 hours per week at the bank's branch in Brownstown, Michigan.

Alastra dep. 89-90. She would also occasionally work shifts at the Southfield-High branch in Ecorse, Michigan. Alastra's responsibilities were typical of those of a bank teller and included receiving cash and check deposits, processing credit card applications, opening checking accounts, handling cash, processing requests for withdrawals, and, at times, opening the bank's vault in the morning. *Id.* at 92-94. She was told that her responsibilities also included covering for full-time tellers who were on vacation or otherwise absent from work. This required her to be able to arrive at work around 8:30 to 8:45 a.m. on occasion. *Id.* at 96-98, 187-88.

As an employee with relatively low seniority, Alastra also worked Saturdays, which were busy days for the bank. *Id.* at 97. This required her to arrive at work in the mornings on Saturdays. *Id.* at 98. She was scheduled to work some Saturday shifts beginning in the morning. *Id.* at 99, 190-91.

In September 2007, National Bank transferred Alastra to the bank's branch in Ecorse, Michigan. *Id.* at 168. Her duties remained the same, and her schedule varied depending on the needs of the branch and availability of the other tellers. *Id.* at 174-75. Part-time tellers were required to work one full day per week, starting at 8:45 a.m. *Id.* at 190. Alastra understood her role as a part-time teller at the Ecorse branch to provide teller coverage in the mornings. *Id.* at 190-91.

Although Alastra was told when hired that part-time tellers were to cover for full-time tellers -- which included working in the morning -- there is no testimony or documentary evidence proffered by National City or its employees to support the contention that the ability to work mornings is a fundamental requirement of part-time tellers. Wanra Pearson, one of Alastra's supervisors at the Ecorse branch, testified that National City tries to accommodate their employees, and that had Alastra requested a later start time, Pearson

3

could have assigned Alastra to shifts starting no earlier than 11:00 a.m. Pearson dep. 57, 87-88. Pearson also testified that when Alastra began working at the Ecorse branch, there was a part-time schedule of Monday through Friday, 12:45 p.m. to 4:45 p.m. *Id.* at 58. This schedule was formerly filled by another part-time teller by the name of Sharnita Grant. *Id.* And before Grant, another employee filled the position.[1] *Id.* at 64.

National City's attendance policy is discretionary, but not overly so. The employee handbook, a copy of which Alastra admits she received, *id.* at 103, states:

> Excessive absenteeism not covered by Family and Medical Leave Act (FMLA) may be cause for disciplinary action, unsatisfactory performance ratings and/or termination of employment. Managers will determine what is excessive and in that determination will consider such things as frequency of the absences, reasons for the absences and the amount of time off. In general, absences may be considered excessive when there is a pattern of poor attendance. The discretion of the manager is important in determining if an excessive absenteeism pattern has occurred.

Pl.'s Resp. Br. ex. I.

National City also issued attendance guidelines to provide continuity among the Detroit and Toledo branches in enforcing the attendance policy. Pearson Decl. ¶ 3. The guidelines are progressive and provide that if an employee is absent ten times in one year, the employee should be fired. Defs.' Mot. ex. C-1. Alastra's understanding of National City's attendance policy was that after receiving six absences, a warning was given for absences six through nine, and after the tenth absence, the employee would be terminated. Alastra dep. 103-04.

Between June and September 2007, Alastra was absent on six occasions. Defs.' Mot. ex. D-1. Then on October 3, 2007, she was absent again because of a seizure. Because

---

[1] Pearson also testified that she offered Alastra this afternoon schedule, but Alastra declined it. Pearson dep. 58. Alastra denies this offer was ever made. Alastra dep. 173, 214. The Court assumes on summary judgment that Pearson never offered the schedule.

4

this was her seventh absence, Alastra received verbal counseling and a Performance Improvement Feedback and Coaching Plan. Defs.' Mot. ex. A-9. National City decided to place Alastra on a discretionary leave of absence in order to provide her with time to adjust to the side effects associated with her change in seizure medication. Alastra requested the leave on the advice of her doctor. Alastra dep. 181-83. She was on leave from October 6 to November 12, 2007, and was paid during this period. *Id.* at 182-83.

Alastra returned to work on November 12, 2007, and provided her employer with a disability certificate from her doctor stating that she had been completely incapacitated from October 2, 2007 to November 11, 2007, and certifying that she had recovered sufficiently to be able to return to her regular work duties on November 12, 2007. The certificate listed no restrictions. Defs.' Mot. ex. A-13.

Alastra was absent from work again on November 28, 2007 because of a seizure. Alastra dep. 198-99. This being her eighth absence, she received a Performance Improvement Directive Counseling and Action Plan. Defs.' Mot. ex. A-16. The document indicated that Alastra needed to comply with the attendance policy or she could face probation or termination. *Id.*

Around the beginning of December 2007, Alastra requested a later start time of 10:00 a.m. or later, on a permanent basis. Alastra dep. 193-94. She made the request three times to her supervisors, each time advising them that the later start time was needed to prevent or reduce her seizures, since the seizures tended to occur more often when Alastra woke early in the morning. *Id.* Her supervisors never granted the requests, nor did they expressly deny them, only advising Alastra on occasion that they were in the process of checking with upper-level management about the requests. *Id.* at 193.

Then, on December 26, 2007, a day Alastra was scheduled to start at 8:45 a.m., Alastra was again absent because she had a seizure. Alastra dep. 200-01. Since this was her ninth absence, the bank issued her a Disciplinary Counseling Probationary Notice placing her on a 90-day probation period due to excessive absences. *Id.* at 201; Defs.' Mot. ex. A-17. The notice warned Alastra that further absences could result in termination. *Id.* Alastra testified that she was aware at this time that she could be fired if she was absent once more during the probationary period. Alastra dep. 202.

On January 4, 2008, while Alastra was on probation, she was absent for the tenth time since she began working at National City. Alastra dep. 203-04. Her managers contacted the Human Resources Department for a recommendation as to whether Alastra should be terminated for violating the attendance policy while on probation. Based on the prior verbal warnings, written warnings, and probation status, the Human Resources Department recommended Alastra be terminated for excessive absences. On January 8, 2008, her managers met with her to discuss her prior absences and informed her that she was fired for excessive absences and attendance issues. Alastra dep. 206.

Alastra filed a charge with the Equal Employment Opportunity Commission and received a right-to-sue letter. Compl. ¶ 7. This action followed shortly thereafter.

## DISCUSSION

I. <u>Legal Standard - Rule 56</u>

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party.

6

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). If a jury could find for the non-moving party based on the evidence in the record, summary judgment must be denied.

## II. Analysis

Alastra claims National City fired her for the reason that she has epilepsy, and that they failed to accommodate her with a later start time in violation of both the Americans with Disabilities Act and Michigan's Persons with Disabilities Civil Rights Act. The language of the Michigan statute mirrors that of the federal statute, and both forbid an employer from discriminating on the basis of an employee's disability, which includes failing to provide a reasonable accommodation. *Smith v. Chrysler Corp.*, 155 F.3d 799, 804 (6th Cir. 1998); *see also* Mich. Comp. Laws § 37.1102(2) & 1202(1). Also, the analysis of claims under the Michigan law parallels the analysis of claims under the federal law. *Id.* (citing *Monette v. Electronic Data Sys., Corp.*, 90 F.3d 1173, 1178 n. 3 (6th Cir. 1996)). Accordingly, the Court's resolution of Alastra's claims under the federal statute also resolves her claims under the Michigan statute, and the Court analyzes her claims by references to the federal claim. *Id.* The parties takes this approach as well.

### A. Disparate Treatment

To prevail on a discrimination claim by way of disparate treatment, a plaintiff must demonstrate that: 1) she is an individual with a disability; 2) she is otherwise qualified to perform the job requirements, with or without a reasonable accommodation; and 3) she suffered an adverse employment action because of her disability. *See Holiday v. City of*

7

*Chattanooga*, 206 F.3d 637, 642 (6th Cir. 2000) (citing *Monette*, 90 F.3d at 1178. If a plaintiff has no direct evidence of discrimination, she may attempt to prove discrimination through circumstantial evidence using the burden-shifting approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *Smith*, 155 F.3d at 805. Under this approach, the plaintiff bears the burden of establishing a prima facie case of discrimination. *Id.* If the plaintiff establishes a prima facie case, an inference of discrimination arises and the burden of production shifts to the employer to offer a legitimate non-discriminatory reason for firing the plaintiff. *Id.* If the employer offer such a reason and supports the reason with evidence sufficient for a jury to agree with the reason, the burden returns to the plaintiff to demonstrate that the employer's reason is merely a pretext for unlawful discrimination. *Id.* The ultimate burden of proving that the employer discriminated against the plaintiff on account of the disability remains with the plaintiff at all times. *Id.*

1. Prima Facie Case

To establish a prima facie case of disparate treatment, a plaintiff must demonstrate that: 1) she is disabled, 2) she is otherwise qualified for the job, with or without reasonable accommodation, 3) she suffered an adverse employment action, 4) her employer knew or had reason to know of the disability, and 5) following the adverse employment action, she was replaced by a non-disabled person, the position remained open, or that similarly-situated non-protected employees were treated more favorably than the plaintiff. *Potter*, 488 F.3d at 404.

a. Disability

Relevant here is the ADA's pronouncement that a disability is "a physical or mental impairment that substantially limits one or more of the major life activities of such

individual." 42 U.S.C. § 12102(2)(A);[2] *see Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 780 (6th Cir. 1998) (citing earlier version of ADA). Epilepsy is not a disability *per se* and the Court's task is to determine whether a jury could find that Alastra's epilepsy substantially limits one or more major life activities. *See Rutlin v. Prime Succession, Inc.*, 75 F. Supp. 2d 735, 737 (W.D. Mich. 1999) (citing *Deas v. River West, L.P.*, 152 F.3d 471, 477-78 (5th Cir. 1998)); *see also Sutton v. United Airlines, Inc.*, 527 U.S. 471, 483 (1999) ("whether a person has a disability under the ADA is an individualized inquiry."), *superseded on other ground by statute*, ADA Amendments Act of 2008, Pub. L. 110-325, 122 Stat. 3553.

National City does not dispute that epilepsy is a physical or mental impairment. Whether a physical impairment is substantially limiting depends on whether it renders the person with the impairment unable to perform a major life activity that the average person in the general population can perform, or significantly restricts the "condition, manner or duration under which an individual can perform a particular major life activity" relative to an average person in the general population. 29 C.F.R. § 1630.2(j)(1). The inquiry requires consideration of the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long term impact resulting from the impairment. *Id.* "Major life activities" include functions such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and

---

[2] The ADA was recently amended by the ADA Amendments Act of 2008, Pub. L. 110-325, 122 Stat. 3553. The amendments, which became effective on January 1, 2009, do not apply retroactively to govern conduct occurring prior to January 1, 2009. *See Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 565-67 (6th Cir. 2009). Since National City terminated Alastra before that date, the Court applies the ADA as written before it was amended. Unless otherwise indicated, all citations to the ADA are to the ADA before it was amended.

working." *Id.* § 1360.2(i).³ This list is not exhaustive. *Cf. Bragdon v. Abbott*, 524 U.S. 624, 639 (1998) (identical definition of "major life activities" in Rehabilitation Act regulations is illustrative of major life activities, not exhaustive of them).

Applying the above standards, the Court concludes that a jury could find that Alastra's epilepsy substantially limits various major life activities. Though medication can help reduce the chances of Alastra having a seizure, it cannot remove the potential for seizures. *See Sutton v. United Air Lines*, 527 U.S. 471, 482 (1999) (court must consider effects of all ameliorative medications when determining whether plaintiff is disabled).⁴ Indeed, even when taking medication, Alastra still suffers from seizures on a not infrequent basis. Her epilepsy prevents here from bathing herself and driving. *See Otting v. J.C. Penney Co.*, 223 F.3d 704, 710 (8th Cir. 2000). It also severely restricts her ability to care for her child by herself. *See Emory v. AstraZeneca Pharms. LP*, 401 F.3d 174, 181 (3d. Cir. 2005). She is also unable to make herself breakfast, prepare hot meals, perform chores, and shop for groceries, all tasks a jury could find are major life activities.

The Court finds particularly instructive the Eighth Circuit's decision in *Otting v. J.C. Penney Co.*, 223 F.3d 704, on which Alastra relies. National City does not attempt to

---

³ The 2008 amendments expanded the list of major life activities to include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." Pub. L. 110-325, § 4(a) (codified at 42 U.S.C. § 12102(2)(A)). Because the amendments do not apply here, *see supra* note 2, the Court applies the ADA and interpretative regulations as written prior to being amended.

⁴ By enacting the 2008 amendments to the ADA, Congress rejected *Sutton's* instruction that courts must consider the effects of all ameliorative medications when determining whether a plaintiff is disabled. *See Verhott v. Time Warner Cable, Inc.*, 299 F. App'x 488, 492 n.3 (6th Cir. 2008) (citing Amendments Act of 2008, Pub. L. No. 110-325, § 3(4)(E)(i), 122 Stat. 3553 (2008)); *see also* 42 U.S.C. § 12102(4)(E)(i) (as amended). But since the amendments do not apply in this case, *see supra* note 2, *Sutton* applies, and the Court must consider the effects of medication on Alastra's epilepsy.

distinguish *Otting* in its reply brief. In that case, the court affirmed the district court's denial of the defendant's motion for judgment as a matter of law on the issue of whether the plaintiff was disabled under the ADA. The plaintiff suffered from epileptic seizures, which, although sporadic, occurred frequently enough that she was prohibited by law from driving and bathing by herself due to risk of serious injury or death. *Id.* at 710. She suffered approximately two or three seizures per month. During a seizure, she became unable to see, hear, speak, walk or work. *Id.* The seizures lasted between 30 seconds and two minutes. Following a seizure, the plaintiff would be lethargic, shaky, and have difficulty concentrating. Depending upon the severity of the seizure, the after-effects lasted between ten minutes and thirty-six hours. *Id.* The court concluded that despite the attempt to control her seizures with medication, the plaintiff met the definition of disabled found in the ADA in that she "suffered from a physical impairment which substantially limited the major life activities of walking, seeing and speaking." *Id.* at 711. Alastra's symptoms are similar to those of the plaintiff in *Otting*. *Compare id.* at 710 *with* Alastra aff. ¶¶ 3-6. A jury could similarly find that Alastra's epilepsy substantially limits her ability to walk, see, and speak when having a seizure, even when appropriately medicated.

National City contends that Alastra is not disabled because she was only temporarily limited in major life activities as a result of side effects of medication she was taking at one point, side effects which abated once she changed her medication. While it appears that the side effects of the medication ceased when Alastra changed medications, Alastra still suffers from seizures even when medicated. National City overlooks Alastra's symptoms when having a seizure, symptoms which must be considered in the analysis. Accordingly, there is evidence from which a jury could conclude that Alastra is disabled under the ADA.

b. <u>Otherwise Qualified for the Position</u>

The ADA defines a qualified individual with a disability as:

[A]n individual with a disability who, with or without reasonable accommodation, *can perform the essential functions of the employment position* that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8) (emphasis added). "A job function is essential if its removal would fundamentally alter the position." *Kiphart v. Saturn Corp.*, 251 F.3d 573, 584 (6th Cir. 2001). The employer has the burden of proving by a preponderance of the evidence that a particular job function is essential. *See Hamlin v. Charter Twp. of Flint*, 165 F.3d 426, 431 (6th Cir. 1999). The inability to meet the attendance requirement of the position can "fundamentally alter" a position that requires attendance to perform tasks. *See Brenneman*, 366 F.3d at 419.

National City cites to two functions of the position it deems essential that are Alastra could not perform. First is the ability to work on a consistent basis, which means being absent less than 10 times in one year. According to National City, Alastra's excessive absences rendered her unable to meet this requirement. To support this contention, National City cites Alastra's deposition testimony that it was her understanding that an employee normally would be fired upon incurring 10 absences. National City also cites the attendance guidelines applicable to the Detroit and Toledo branches, which provide that an employee's tenth absences should result in termination.

Neither of these pieces of evidence, however, sufficiently supports National City's claim that the requirement of not incurring 10 absences in one year is an *essential* function of the part-time teller position, only that the requirement is typical of the job. For instance,

12

the guidelines demonstrate only that employees *should* be terminated if they reach 10 absences in one year, not that they had to be fired. Also, Pearson obtained a recommendation from the Human Resources department prior to terminating Alastra. If termination was mandatory at 10 absences, no recommendation would have been required or even permitted. Moreover, National City's employee handbook is the authoritative source for the bank's absence policy, and the guidelines simply *inform* the managers' application of the handbook's attendance policy. The handbook provides that the discretion of the manager is essential in determining whether an employee has been excessively absent and should be fired. The fact that the managers have discretion in dealing with absences, even when 10 have been incurred further undermines the claim that the ability not to incur 10 absences in one year is an essential function of the job. Finally, the fact that Susan Valdes, a part-time employee at the bank's Southgate Main Office, was permitted to incur more than 10 absences before being terminated for excessive absenteeism also undermines the notion that not incurring 10 absence in a year is essential. *See* Pl.'s Resp. Br. ex. P.

But even if the ability to incur less than 10 absences in one year were an essential function of the position, Alastra could have met the requirement had she been provided with a later start time, an accommodation that was, for reasons stated below, not unreasonable. A jury could find that with this accommodation she could have obtained more sleep and would have been able to make most, if not all, of her shifts. Alastra aff. ¶¶ 7-9.

Second, National City contends that the ability to provide coverage for full-time employees, regardless of the time of their shifts (including shifts beginning in the morning), is an essential function of part-time teller position. Notably, National City has offered no evidence of its own (as opposed to the understandings of Alastra), such as a formal job

description, which demonstrates that working morning shifts is an essential function of the position. National City relies on Alastra's testimony that it was her understanding that part-time tellers were supposed to cover shifts for full-time tellers, including full-day shifts starting in the morning. Again, Alastra's personal understanding does not demonstrate that the functions were *essential*, but only that they were typical. Additionally, Pearson testified that she could have scheduled Alastra for shifts that consistently began at 11:00 a.m. or later to assist with Alastra's medical condition. Pearson dep. 87-88. Furthermore, there once existed at the Ecorse branch a permanent schedule for part-time tellers that began at 12:45 p.m. and ended at 4:35 p.m., Monday through Friday. *Id.* at 58, 64. This evidence draws into question National City's assertion that working morning shifts is an essential function of the position.

National City contends that even if it had provided Alastra with a later work schedule, she still would have been unable to attend work because she had to sleep for at least eight hours after having a seizure. Thus, National City argues, regardless of when her shift began, Alastra would have been unable to attend because she would be recovering from a seizure for the entire day. Alastra responds, and the Court agrees, that a jury could find that she was having more frequent seizures because she was consistently having to work morning shifts at the Bank, and for that reason was not getting enough sleep. But, if afforded a later start time, the frequency of her seizures would have decreased and she would have been able to make most, if not all, of her work shifts. Alastra states that when she was able to consistently wake later in the day, she had far less seizures, and, if afforded a later start time, would not have been absent 10 days in a one year period. Alastra aff. ¶¶ 7-9.

The Court concludes that a jury could find that Alastra was qualified for the part-time teller position.

c. Remaining Elements of the Prima Facie Case

Alastra suffered an adverse employment action when she was fired, so the third element of the prima facie case is established. The fourth element is also satisfied because Pearson and Miller, Alastra's managers, were aware that she suffered from epilepsy. Alastra dep. 194; Pearson dep. 28, 34; Miller dep. 17-18.

The fifth and final element may be proved by showing that similarly-situated non-protected employees were treated more favorably than the plaintiff. *See Potter*, 488 F.3d at 404. Alastra relies on this method. She contends that Susan Valdes, a non-disabled part-time teller at the Southgate Main Office branch was treated more favorably because Valdes was permitted to incur ten absences in a one year period without being fired. National City contends that Valdes is not similarly-situated to Alastra because she worked in a different branch, had a different supervisor, and did not have the same conduct or work experience as Alastra.

It was National City, however, that offered Valdes as a comparator in its opening brief. *See* Defs.' Br. at 15 & 17; *see also* Craycraft Decl. ¶ 4 and attached ex. 1. Moreover, a plaintiff need only be similarly-situated to comparators in *relevant* aspects, not all aspects. *See Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004). The relevant respects here are that both Alastra and Valdes were employed as part-time tellers with the same responsibilities at branches governed by the same attendance guidelines and policy, and both received ten absences in a one year period. Alastra was fired at 10 absences while Valdes was given probation. Although slight, there is sufficient evidence for a jury to find that Alastra was treated less favorably than non-disabled similarly situated part-time tellers.

15

Although Alastra's demonstration on the last prong of the prima facie case is relatively weak, the Court finds there to be sufficient evidence for a jury to conclude by inference that Alastra was fired, in part, because she had epilepsy.

2. Pretext

National City contends that Alastra was legitimately fired because she was unable to meet the attendance requirement of the position by being absent 10 times in one year. The burden now shifts to Alastra to demonstrate that the attendance reason was simply a pretext for discrimination.

The employee has the burden of demonstrating pretext. *Jones*, 488 F.3d at 406. To meet the burden on summary judgment, the employee must provide evidence sufficient for a jury to find that the proffered reason either 1) had no basis in fact, 2) did not actually motivate his discharge, or 3) was insufficient to motivate discharge. *Id.*

Alastra does not contend that her excessive absenteeism had no basis in fact, nor could she since National City's employment guidelines for the Detroit/Toledo branches provide that an employee who is absent from work ten times in a one year period could and should be fired. Defs.' Mot. ex. C-1. Indeed, over the last five years, National City branches in the Southwest Michigan region at least fired four employees (including Alastra) on the alleged basis of excessive absenteeism and tardiness. Craycraft decl. ¶ 4.

Instead, Alastra contends that her absences did not actually motivate the decision to fire her. She cites *Lamar v. Metaldyne Co.*, 240 F. App'x 22, 33 (6th Cir. 2007) for the proposition that an employer's failure to uniformly apply its progressive discipline policy demonstrates pretext. *See also Harrison v. Metro. Gov't*, 80 F.3d 1107, 1117 (6th Cir. 1996) (pretext established where employer did not uniformly apply progressive discipline policy), *overruled on other grounds*, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 19-20 (1993),

16

*as recognized in Jackson v. Quanex Corp.*, 191 F.3d 647, 667 n.6 (6th Cir. 1999). Alastra argues that National City's failure is demonstrated by its treatment of Valdes, the non-disabled part-time teller who incurred ten absences in a one-year period but was not fired.

National City argues that its failure to fire Valdes does not demonstrate a non-uniform application because Valdes was not similarly-situated to Alastra. The Court has already determined that a jury could find the two women similarly-situated. Moreover, even if they were not so situated, the fact that Alastra was fired, while Valdes was spared when both incurred 10 absences, still demonstrates that the guidelines were not being applied uniformly. This is sufficient evidence for a jury to find pretext in this case.[5]

Viewing the evidence in the light most favorable to Alastra and making all reasonable inferences in her favor, the Court concludes that Alastra could demonstrate a prima facie case of disparate treatment on account of her epilepsy and that National City's justification for firing her was a pretext for discrimination. Accordingly, the Court will deny National City's motion for summary judgment with respect to Alastra's claim of disparate treatment.

B. Failure to Accommodate

Alastra's second theory of liability is that National City refused to accommodate her by not scheduling her for shifts that began at 10:00 a.m. or later. The ADA imposes an affirmative duty on employers to provide "reasonable accommodations to the known physical or mental limitations" of their otherwise qualified employees. 42 U.S.C. § 12112(b)(5)(A). The plaintiff has the burden of establishing a prima facie case of discrimination based on failure to accommodate. *Gaines v. Runyon*, 107 F.3d 1171, 1175 (6th Cir. 1997). To do so, a plaintiff must show that 1) she is an individual with a disability

---

[5] Alastra contends that other evidence of pretext exists as well, but the Court need not address those arguments, having already found a jury could find pretext on the basis of non-uniform application of its progressive discipline policy.

within the meaning of the ADA, 2) she is otherwise qualified to perform the essential functions of the job at issue, with or without an accommodation, 3) her employer was aware of her disability, 4) an accommodation was necessary, i.e., a causal relationship existed between the disability and the request for accommodation, and 5) the employer failed to provide the necessary accommodation. *Id.* Once the plaintiff makes a prima facie case, the burden shifts to the employer to demonstrate that the employee cannot reasonably be accommodated because the accommodation would impose an undue hardship. *Id.* at 1175-76.

For the reasons stated in the analysis of Alastra's prima facie case of disparate treatment, Alastra can establish the first three elements of her prima facie case. She can also satisfy the fourth element, a causal relationship between the requested accommodation and the disability. The plaintiff has the burden of proposing an accommodation and demonstrating its objective reasonableness. *See Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007). Alastra requested later start times for her shifts. This accommodation arguably would have allowed her to obtain more sleep and thus reduce the chances of having a seizure. A jury could find the proposed accommodation objectively reasonable.

National City contends that even if it provided Alastra with a later start time, she would still be unable to attend work on the days she had seizures because she was required to sleep for eight hours after a seizure. As the Court has already indicated, a jury could find that a later start time would have reduced the amount of seizures and allowed Alastra to be absent from work significantly less often than she would have been without the accommodation. Accordingly, a jury could find a causal relationship between the requested accommodation and the disability.

The last element of the prima facie case is also satisfied because, despite Alastra's numerous requests, she was never provided a work schedule with later start times.

The burden now shifts to National City to demonstrate that the requested accommodation was unreasonable because it would impose an undue hardship. A jury could find that the later start time would not impose an undue hardship, based on the deposition testimony of Pearson that she could have provided Alastra with a schedule requiring that she start work at 11:00 a.m. or later. Pearson dep. 87-88. Additionally, the fact that Pearson had in the past provided a part-time teller with a shift starting at 12:45 p.m. and ending at 4:45 p.m., Monday through Friday, just before Alastra began working demonstrates that the later start time request would not have imposed an undue hardship on the branch office. *Id.* at 58. Despite this testimony, National City argues that a later start time was an unreasonable request because it would remove the essential function of the part-time teller position and require it to create a new one. But based on Pearson's deposition testimony regarding her past practice, and the feasability of offering Alastra a later start time, a jury could conclude otherwise.

The Court concludes that a jury could find that National City failed to provide Alastra with a reasonable accommodation. Accordingly, National City's motion for summary judgment on this theory of discrimination must be denied as well.

## ORDER

**WHEREFORE**, it is hereby **ORDERED** that Defendants' motion for summary judgment (docket no. 31) is **DENIED.**

**SO ORDERED.**

                                            s/Stephen J. Murphy, III
                                            STEPHEN J. MURPHY, III
                                            United States District Judge

Dated: November 16, 2010

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on November 16, 2010, by electronic and/or ordinary mail.

          <u>Alissa Greer</u>
          Case Manager